UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04CV-655-H

PAPA JOHN'S INTERNATIONAL, INC.  　　　　　　　　　　　　　　　　　PLAINTIFF

V.

ENTERTAINMENT MARKETING &
COMMUNICATIONS INTERNATIONAL, LTD,
and JAY COLEMAN  　　　　　　　　　　　　　　　　　　　　　　　　DEFENDANTS

**MEMORANDUM OPINION**

Papa John's International, Inc., ("Papa John's"), has filed suit for a declaration of rights arising from its relationship with Entertainment Marketing & Communications International, Ltd., ("EMCI"), and its CEO Jay Coleman ("Coleman," or, collectively, "Defendants"). Defendants have moved to dismiss due to the absence of personal jurisdiction or, alternatively, for a transfer of venue. Each side has argued well this difficult issue. After thorough consideration, the Court sustains Defendants' motion to dismiss for lack of personal jurisdiction.

I.

The Court has not conducted an evidentiary hearing to determine jurisdiction. Therefore, this factual summary derives from the pleadings and affidavits, taken in the light most favorable to Plaintiff, and without considering Defendants' version of any disputed facts. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1272 (6th Cir.1998) (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir.1996)).

Papa John's is a Delaware corporation with its principal place of business in Kentucky. The company's business spans the entire country. EMCI is a New York corporation with its principal place of business in Connecticut. Coleman resides in Connecticut. Neither Defendant conducts regular business in Kentucky nor owns any property here. In early 2003, Papa John's sought to develop a promotional concept called "Pizza and a Movie," involving the distribution of media content along with pizza sales. After developing the idea for a few months, Papa John's either contacted or was contacted by Coleman on behalf of EMCI. It is not clear who initiated the contact. EMCI presented itself as a marketing firm with ties to the entertainment industry. Papa John's sought EMCI's expertise in securing desirable licensing agreements with film studios.

The parties negotiated towards a mutually acceptable agreement. At no time during the relationship did Defendants physically enter Kentucky. Papa John's chief negotiator, Gary Langstaff, communicated with Defendants from several locations – Kentucky, Colorado, Nevada and California. During this period Langstaff resided in Colorado. Langstaff traveled to New York City to hear Coleman's initial pitch on behalf of EMCI. Coleman traveled to meet with Papa John's representatives such as Langstaff and marketing executive Kevin Matthews in New York, Nevada and California, but never in Kentucky. He met with Papa John's general counsel Rich Emmett in Nevada. In February 2004 Coleman traveled to Nevada to pitch the marketing campaign to Papa John's franchisees.

Papa John's employees in Kentucky communicated via telephone, mail and email with Defendants in New York and Connecticut on the development of the marketing campaign. Specifically, Kevin Matthews described a January 27, 2004, teleconference in which Defendants

discussed their plans to develop and implement the campaign.

Attorneys in Los Angeles and New York City drafted and circulated contracts to memorialize the ongoing discussions. Several areas of disagreement prevented the parties from executing final agreements. By Spring, 2004, the parties still had not reached a final agreement. However, in light of the imminent proposed roll-out date of the "Pizza and a Movie" campaign, Defendants worked on Papa John's behalf with film studios in California and New York to identify acceptable films for distribution. Papa John's accepted a few titles Defendants had recommended. To secure licensing rights to those titles Papa John's contracted directly with the film studios in California and New York. Papa John's also contracted directly with an overseas manufacturer of DVD's, Viva Magnetics, whom Defendants had recommended, to manufacture the DVDs for distribution. Viva shipped the DVDs to Papa John's distribution centers in several states, including Kentucky.

During the summer of 2004 Defendants continued to contact film studios to discuss possible films for the campaign. Soon, Papa John's became dissatisfied with the quality of services Defendants was providing. Papa John's sought out other consultants for help, but remained interested in using Defendants' services on a nonexclusive basis. The parties disagreed on terms of a consulting agreement through the Fall of 2004. Then, in November, 2004, Papa John's filed this declaratory judgment action. At this early stage, the Court is unconcerned with the merits or procedural tactics of the filing. In early 2005, it terminated the "Pizza and a Movie" campaign.

II.

Papa John's has the burden of establishing personal jurisdiction over Defendants in

3

Kentucky. *See Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir.1980). A plaintiff ordinarily proves personal jurisdiction by a preponderance of the evidence. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1272 (6th Cir.1998). However, that standard differs where the Court determines personal jurisdiction based on the pleadings and affidavits alone, without an evidentiary hearing. *Id.* In such circumstances, the Court must consider the pleadings and affidavits in a light most favorable to Plaintiff, and Plaintiff need only make a prima facie showing of jurisdiction to defeat Defendants' motion. *Id.* (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir.1996)). Furthermore, the Court does not weigh the controverting assertions of the party seeking dismissal. *Id.* Here, neither party has requested an evidentiary hearing. The Court will determine personal jurisdiction on the pleadings and affidavits alone.

To determine whether specific jurisdiction exists over a nonresident defendant in a diversity action, the Court must apply the law of the state in which it sits, subject to due process limitations. *Welsh*, 631 F.2d at 439. Under Kentucky's long-arm statute, "a court may exercise personal jurisdiction over a person who acts directly or by an agent as to a claim arising from the person's . . . transacting any business in this Commonwealth . . ." K.R.S. 454.210(2)(a). The Sixth Circuit interprets Kentucky's long-arm statute as extending to the limits of Due Process. Therefore, the two inquiries collapse into the single question of whether Due Process permits the exercise of personal jurisdiction. *Aristech Chem. Int'l., Ltd. v. Acrylic Fabricators, Ltd.*, 138 F.3d 624, 627 (6th Cir.1998) (citation omitted).

To subject a nonresident defendant to personal jurisdiction without violating due process, the defendant must have "minimum contacts" with the forum "such that maintenance of the suit

does not offend traditional notions of fair play and substantial justice." *Internat'l Shoe v. Washington*, 326 U.S. 310, 316 (1945). To determine whether the defendant has the requisite minimum contacts, this Court applies the familiar three-part test followed in the Sixth Circuit:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir.1968). The "purposeful availment" prong of the *Mohasco* analysis is satisfied when the defendant's contacts with the forum state are such that "he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quotation omitted). The defendant's contacts must be more than "random," "fortuitous," or "attenuated." *Id.*

In determining whether an interstate contract can justify the exercise of personal jurisdiction over a nonresident defendant, courts should examine "prior negotiations and contemplated future consequences, along with the terms of the contract and parties' actual course of dealing" to determine whether the "defendant purposefully established minimum contacts within the forum." *Id.* at 479. The Sixth Circuit has repeatedly focused on where the negotiation and performance of a contract occurred. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722 (6th Cir. 2000) (citation omitted). Finally, the quality of a party's contacts with the forum state matter more than the quantity. *Id*.

Papa John's should know of any facts supporting the exercise of jurisdiction over Defendants. However, Papa John's has only broadly and sometimes vaguely described the

5

precise factual basis for jurisdiction in a Kentucky court.  Papa John's says that it engaged in "active and substantial" communications with Defendants from Kentucky.  Yet, it provides little actual factual detail about the substance or circumstances of those communications.  Such detail is necessary in these circumstances to determine whether jurisdiction exists.  An affidavit from Papa John's marketing executive Kevin Matthews explains that Papa John's participated in several communications with Defendants from Kentucky.  Matthews specifically describes a January 27, 2004, teleconference in which Defendants discussed their plans to develop and implement the marketing campaign.

On the other hand, Defendants have provided thorough, unrebutted explanations that most of their contacts with Papa John's occurred outside Kentucky.  Both the negotiation and performance here occurred largely outside of Kentucky.  Defendants never physically entered Kentucky.  For that matter, even Papa John's chief negotiator, Gary Langstaff, mostly communicated with Defendants from locations other than Kentucky – Colorado, Nevada and California.  Defendants met with Papa John's marketing executive Kevin Matthews and general counsel Rich Emmett in states other than Kentucky.  Draft contracts were developed and circulated among attorneys in California and New York.  Defendants pitched the idea for the marketing campaign to a gathering of Papa John's franchisees in Las Vegas.  Defendants began performing on behalf of Papa John's by working with film studios in New York and Los Angeles.  Apparently, Defendants did not ship or deliver products to Kentucky.

The parties argue at length about which derives stronger support from this Court's decision in *Hillerich & Bradsby Co. v. Hall*, 147 F. Supp. 2d 672 (W.D. Ky. 2001).  There, H &

B, a Kentucky corporation, retained Hall, a Georgia baseball coach, to advertise its products. H & B initiated contact indirectly, and Hall responded by calling H & B in Kentucky. H & B's representative in Texas negotiated a contract with Hall. The parties entered into a multi-year agreement. Hall performed the agreement entirely outside of Kentucky. H & B sent payment to Hall in Georgia for his services. Performing the agreement did require that Hall phone and fax H & B in Kentucky several times a year. However, Hall did not physically enter Kentucky during the negotiation or performance of the agreement. In concluding that personal jurisdiction did not exist, the Court explained that all the significant contacts with Kentucky arose from H & B's presence in the state, not from Hall purposefully reaching out to Kentucky. The Court found Hall had not purposefully availed himself of the benefits and protections of Kentucky primarily because of his limited contacts, the passive nature of those contacts, and the absence of obligations performed in Kentucky.

The Court does not find that *Hall* is dispositive one way or another. Each jurisdictional question is decided on its own unique facts. Nevertheless, the central thesis in *Hall* provides some support for Defendants' argument. Our case is also similar to *Hall* in that each defendant performed a service that benefitted a Kentucky corporation. However, the service was performed outside the state. As in *Hall*, the most of the significant contacts with Kentucky arise simply from Papa John's having its headquarters here and performing its own work here, rather than from Defendants either performing or deliberately aiming their conduct here.

More applicable is *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000). There, Rowlette, a Minnesota executive of a Minnesota company, executed two one-year agreements to

be the exclusive manufacturer's representative for Calphalon, an Ohio corporation. The agreement covered five states other than Ohio. The agreement also had a choice of law provision applying Ohio law. Under the agreement Rowlette would promote Calphalon's products, inform Calphalon of market conditions, and develop sales plans. He corresponded with Calphalon via phone, fax and mail, and made two visits to Ohio to meet with Calphalon. Calphalon eventually sued Rowlette in Ohio for breach of contract. The Sixth Circuit affirmed the district court's decision that the exercise of jurisdiction over Rowlette would be improper. As here, Rowlette's performance of the agreement focused solely on states other than Ohio. His contacts with Ohio occurred because Calphalon chose to locate its headquarters there, not because Rowlette sought to do any business or create any consequences there.

*Calphalon* likewise supports Defendants' position. *Calphalon* and *Hall* both show that jurisdiction will not lie solely because the out-of-state defendant has *some* business contacts with the forum state, particularly where the negotiation and performance of the agreement occurs largely out-of-state. That is the case here where Defendants deliberately aimed the overwhelming majority of their conduct at states other than Kentucky.

The most significant Kentucky contacts actually arise from Papa John's own work in developing and implementing the marketing campaign from its headquarters. All of the work that Papa John's performed to implement its own marketing plans, whether devised by Defendants or others, would not logically count as a contact of Defendants with the state. For instance, that Papa John's may have ultimately caused more DVD's or CD's to be delivered to Kentucky does not count as a contact of Defendants with the state, nor do the "multiple internal

meetings" Papa John's held to discuss matters relating to EMCI and the marketing campaign. While Kentucky has an interest in seeing that its citizens receive compensation for their injuries, that interest will not carry the day where sufficient contacts with Kentucky are lacking.

Ultimately, the Court cannot find evidence that Defendants "engaged in significant activities within [Kentucky]." *See Burger King,* 471 U.S. at 476 (citation omitted). There was virtually no evidence that Defendants solicited business in Kentucky or that they actually performed work in Kentucky. *See Auto Channel, Inc. v. Speedvision Network*, 995 F.Supp. 761, 765 (W.D. Ky. 1997). Plaintiffs produced no evidence that Defendants derived substantial revenues from business in Kentucky. *Id.* Whatever agreement was reached, was not reached in Kentucky. Nor did any goods provided by Defendants pass title in Kentucky. *See Gateway Press, Inc. v. Leejay, Inc.*, 993 F.Supp. 578, 581 (W.D. Ky. 1997). Nor is it clear that Kentucky law would necessarily govern the substantive issues as in *Gateway*. *Id*. The facts here do not present the case of a corporation reaching out to create an on-going series of relationships with a Kentucky customer involving numerous billings, shipment of product to or from the state and substantial sums of money. *See Medical Distribution, Inc. v. Quest Healthcare, Inc.*, No. 3:00CV-154-H, 2002 WL 32398447 (W.D. Ky. Feb. 1, 2002). Consequently, applying the applicable jurisdictional principles to the facts of record, the Court concludes that Defendants did not purposefully avail themselves of the benefits and protections of doing business in Kentucky.[1]

---

[1] Having concluded that Defendants failed to establish the first prong of the *Mohasco* analysis, the Court need not analyze the remaining prongs, nor the additional grounds to dismiss offered by Defendants.

The Court will enter an order consistent with this Memorandum Opinion.

cc:   Counsel of Record